IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TINISHA D. PRESTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:09-cv-0485-SRW |
| | ) (WO) |
| MICHAEL J. ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Tinisha D. Preston brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this action remanded to the Commissioner for further administrative proceedings.

**BACKGROUND**

On October 19, 2006, plaintiff filed an application for Supplemental Security Income (SSI). On April 24, 2007, after the claim was denied at the initial administrative level, plaintiff filed a timely written request for a hearing. Thereafter, on August 28, 2007, plaintiff

submitted a form waiving her right to appear personally and testify at a hearing.[1]  The ALJ rendered a decision on November 26, 2007.  The ALJ concluded that plaintiff suffered from the severe impairments of bipolar I disorder without psychotic features and low intellectual functioning. (R. 17).  He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act.  On March 25, 2009, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

---

[1] On April 16, 2007, plaintiff signed a request for hearing indicating that she did not wish to appear at the hearing, but she did not complete a waiver form. (R. 30, Block 7).  Plaintiff's mother subsequently signed the form for the waiver of the right to appear at the oral hearing (R. 32) and the accompanying letter sent by the ALJ offering plaintiff the opportunity to reconsider the waiver (R. 31).  There are no documents in the record indicating that plaintiff's mother has been legally appointed as plaintiff's guardian or designated by plaintiff as her representative in the social security proceedings; thus, the mother's signature raises an issue regarding whether the plaintiff – who was twenty years old when she filed her application and has personally signed all other forms in the record – has waived her right to appear at an oral hearing.

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff alleges disability due to bipolar disorder, manic depression, back problems, and headaches.  (R. 41).  She explains that these impairments make her unable to stand or walk for prolonged periods, and that she is paranoid around other people.  Her alleged onset date is May 1, 2006. (Id.). The record indicates that plaintiff dropped out of high school, which she explained was due to trouble at home and her failing her math class. (R. 176). Through the Job Corps, where plaintiff reported that she worked from August 2005 to April 2006 (R. 41-42), plaintiff earned her GED and received training to work in medical records (R. 176, 270).  Plaintiff has also worked briefly as a housekeeper and a packer.  She stated that she quit the housekeeping job because her back pain made her unable to do the work (R. 270), and she was let go from the packing job because she missed too many days of work, even though she had doctor's excuses (R. 65).

Plaintiff presented to the emergency room at Baptist Medical Center South on October 10, 2006, complaining of auditory hallucinations that were commanding her to kill herself. (Exhibit 1F). Plaintiff was subsequently admitted to Meadhaven for psychiatric care. Upon admission, plaintiff's preliminary assessment was "probably a psychotic illness" and substance abuse, and her Global Assessment of Functioning (GAF) score was assessed at 30. (R. 122). Plaintiff completed a Mini Mental State Exam (MMSE), where she scored 30 out of 30. (R. 139-40). In a discharge summary dictated on October 16, 2006, Dr. Eric B. Hedberg diagnosed plaintiff with bipolar disorder, type 1, manic, in remission, and with a GAF score of 65. (R. 95). Dr. Hedberg noted that plaintiff had a history of depressive episodes and manic episodes, but that plaintiff's mood had stabilized over the course of the hospitalization. At the time of discharge, plaintiff did not show obvious signs of mania and was not complaining of depression; plaintiff denied thoughts of harming herself or others; and reported having no auditory or visual hallucinations or delusions. Dr. Hedberg further noted that plaintiff had planned to begin vocational rehabilitation to prepare her for the workforce, and that plaintiff was "very invested in taking the course to help her become employed." (Id.). Plaintiff was discharged with instructions to continue Abilify and Lamictal as ordered, and to keep a scheduled follow-up appointment at the Montgomery Area Mental Health Center. (R. 168).

Following her discharge from Meadhaven, plaintiff began receiving counseling services from the Montgomery Area Mental Health Center beginning October 23, 2006. (Exhibit 2F). On intake, plaintiff complained of auditory hallucinations, paranoia, anhedonia, anger, and withdrawal from others; plaintiff also reported depression and mania – plaintiff

described writing on herself, the walls and doors of her closet, and on notebooks. Plaintiff was diagnosed with bipolar disorder, mixed, severe, with psychotic features (R. 183), and assessed with a GAF score of 60. (R. 181). The therapist noted that plaintiff had drawn a black cross on her arm in order to "help her sleep." (R. 178). In a progress note dated December 15, 2006, plaintiff was described as having an inappropriate affect, with no eye contact, and an anxious mood. Her appearance/grooming were appropriate, her sleep was fair, and her appetite was good. The mental health therapist stated that the plaintiff was stable on her medications. (R. 171).

      Dr. Judith Rogers performed a consultative psychological examination on February 19, 2007. (Exhibit B5-F). Dr. Rogers noted that plaintiff developed symptoms of psychosis in late 2005, after the birth of plaintiff's daughter. Plaintiff explained that she was unable to work because of her back problems and frequent headaches. Plaintiff further explained that her medications have helped her; her sleep is better, and she no longer hears voices or has suicidal thoughts. Dr. Rogers noted that plaintiff's "depression is better, but that she still has some days when she feels down[;]" "she still avoids being around people and says that she feels like people are going to hurt her and she generally does not trust people." (R. 270). Plaintiff denied having hallucinations, but explained that she fears going to the grocery store because someone may harm her. Dr. Rogers noted that plaintiff's fund of information was quite poor; she had a hard time understanding the concept of similarities; and could not interpret proverbs at all. When assessing plaintiff's intelligence, Dr. Rogers stated,

> No IQ testing was requested. Based on [plaintiff's] lack of knowledge about how the world works, I am surprised that she was ever actually able to get any

5

> sort of high school diploma. I would estimate that [plaintiff's] actual IQ is probably around 70, possibly slightly lower.
>
> [Plaintiff] does not appear to have ever lived independently. She seems to have never tried to get a driver's license or learn to drive. This probably is because no one in the family owns a car. She has never registered to vote. She identifies her main enjoyment in life as sleeping. She watches comedies and scary movies (which probably are not good for her paranoia). In general, nothing in her history suggests that she has ever functioned above the level of Mild Mental Retardation.

(R. 272). Dr. Rogers also noted limited daily activities, including watching television, sitting around the house with her grandmother, and washing clothes.

Dr. Rogers diagnosed plaintiff with "Bipolar disorder I, most recent episode unspecified, severe, currently without psychotic features (but prior to start of treatment with psychotic features)" on Axis I; probable mild retardation on Axis II, but noted that "no tests results were available but history and interview suggest low intellectual functioning throughout her lifetime[;]"; and a GAF score of 65. (R. 273). Dr. Rogers commented that plaintiff "appears to have a number of problems in relating to other people and trusting others." Plaintiff's prognosis was guarded. Dr. Rogers stated that plaintiff has "shown improvement with medication and appears to be compliant with taking medication," but Dr. Rogers suspected that "low intellectual functioning is part of the problem, although that does not seem to have been diagnosed." (Id.). Dr. Rogers described plaintiff as having vague thoughts about eventually going to vocational rehabilitation, and is waiting for her mental health worker to get her into the facility. Dr. Rogers further explained that plaintiff "does not show any particular enthusiasm or hope for finding employment, and generally it seems to be a foreign concept since no one in her family seems to have ever been employed that she

6

knows of." (Id.). In Dr. Rogers' opinion, plaintiff's "ability to obtain and maintain employment appears to be fairly poor," but plaintiff might be a candidate for vocational rehabilitation. (Id.). Lastly, Dr. Rogers opined that plaintiff "does not appear to be competent to manage any benefits for which she might qualify, due to her inability to do simple math and her apparent lack of knowledge of how and what needs to be done in the world." (Id.).

Dr. Eugene E. Fleece completed a Psychiatric Review Technique and a Mental Residual Functional Capacity assessment on February 27, 2007. (Exhibit 7F-8F). Dr. Fleece concluded that plaintiff is markedly limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to interact appropriately with the general public. (R. 290-91). Dr. Fleece assessed plaintiff with moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. (R. 286). Dr. Fleece noted that plaintiff's score of 30 out of 30 on the MMSE she completed while admitted to Meadhaven "suggest[s] a possibility of higher intellect than she presented on [Dr. Rogers' consultative examination] for disability." (R. 288). He also noted that plaintiff's GAF score of 65 was "surprisingly high." (Id.). Plaintiff's functional capacity assessment stated that she could understand and recall simple work related materials and procedures; execute 1-2-3 step commands without difficulty; concentrate for 2 hour periods and, if given routine breaks, could make an 8 hour day; and will miss a day of routine duties monthly due to her bipolar disorder. Plaintiff's contact with the general public should be eliminated; she could adapt

to workplace changes that are simple or gradually introduced, or well-explained; and she could learn to make simple, repetitive workplace decisions. (R. 292).

On June 11, 2007 – three and a half months after Dr. Fleece reviewed plaintiff's record – Dr. Hedberg completed a "Statement of Incapacitating Condition" form for Montgomery County Department of Human Resources. (Exhibit 9F; see also R. 95-96, 106-07 (Dr. Hedberg's treatment notes and discharge summary from Meadhaven)). Dr. Hedberg indicated that plaintiff was most recently examined at the mental health center on May 16, 2007 and on June 11, 2007. As of the latter date, he diagnosed plaintiff with "Schizoaffective Disorder, Bipolar Type 295.7." He referenced "severe auditory [and] visual hallucinations" and "paranoid ideas." He further noted, "Paranoid others want to harm her. Does not go out of house alone. Isolates. Has severe anger episodes with black-outs." He indicated that plaintiff's condition has "substantially reduced [her] ability to work," and that he expected that she would be unable to work full time for "more than 6 months." (R. 294-95).

Plaintiff reported on her physical activities questionnaire that she washes clothes and sweeps the bathroom, but she needs assistance with her personal care, cooking and preparing meals, household chores, and shopping. (R. 56-61). Plaintiff explained that she feels safer by herself, and does not trust people. (R. 64). Plaintiff has a daughter, but she reports that her grandmother primarily takes care of the child. (R. 270).

The ALJ sent a written interrogatory to a vocational expert, requesting that he assess plaintiff's ability to work in light of her limitations. (R. 85). The ALJ asked the vocational expert to assume that the plaintiff was able to perform the full range of light work, and to

consider the limitations contained in Dr. Rogers' (Exhibit 5F, page 5) and Dr. Fleece's (Exhibit 7F-8F) opinions.[1]  The vocational expert opined that he was doubtful that plaintiff could obtain or maintain employment, either her past relevant work or any other jobs, based on Dr. Rogers' opinion.  However, the vocational expert stated that Dr. Fleece's opinion suggests that plaintiff "can work at simple repetitive jobs with little interaction with the general public."  He concluded, "utilizing [Dr. Fleece's opinion]," that plaintiff could return to her past relevant work as a packer and housekeeper, or she could work as a shirt presser. (R. 85).

The ALJ concluded that plaintiff suffered from the severe impairments of bipolar I disorder without psychotic features and low intellectual functioning.  He found her back problems and migraine headaches to be non-severe impairments. At step three of the sequential evaluation, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 416.920(d), 416.925, 416.926. In reaching his conclusion, the ALJ referred to Dr. Rogers' opinion, which reflected plaintiff had reported that her medications helped her sleep better, that she no longer hears voices or has suicidal thoughts; to Dr. Hedberg's report (upon plaintiff's discharge from Meadhaven) that plaintiff was invested in taking vocational rehabilitation courses and counseling; and to plaintiff's ability "to perform upkeep, do some washing and take care of her child." (R. 19).

---

[1] The letter to the vocational expert also requested that the VE consider plaintiff's work history report (Exhibit B-3E) and her adult disability report (Exhibit B-2E).

The ALJ then proceeded to step four, where he assessed plaintiff's residual functional capacity. The ALJ stated,

> After careful consideration of the record, the undersigned finds that [plaintiff] has the residual functional capacity to perform light work and those limitations found in Exhibits B2-E, B3-E, B5-F [Dr. Rogers' report], B7-F and B8-F [Dr. Fleece's PRTF and Mental RFC assessment] which reflect [plaintiff] has moderate limitation in activities of daily living, moderate limitation in social functioning, and moderate limitation in maintaining concentration, persistence or pace. The evidence reflects she had an episode of decompensation. I further concur with the opinion of Dr. Fleece on February 27, 2007, and find that the claimant can understand and recall simple related material and procedures, execute 1-2-3 commands without difficulty, concentrate for 2 hours periods with routine breaks while she may need some flexibility with work hours and scheduling, she could remain within competitive limits on psychological grounds; may need greater than average training, but when trained could function adequately on that level of task with average oversight. [Plaintiff] may show some suspicious distractibility if asked to work in close proximity with others, but effect would fade to a degree with exposure.

(R. 19). In reaching his decision, the ALJ assigned great weight to Dr. Fleece's opinion. (R. 20). He also gave "great weight" to Dr. Rogers' opinion; but, he explained that on the issue of plaintiff's ability to work, he gave "greater weight" to Dr. Hedberg's opinion that plaintiff would be able to participate in vocational rehabilitation. (R. 20-21). The ALJ stated, "Dr. Hedberg reported, upon [plaintiff's] discharge from Meadhaven, that the claimant was [in]vested in her courses and counseling from vocational rehabilitation, *which indicated that Dr. Hedberg felt the claimant was capable of performing work activity*." (R. 20)(emphasis added). The ALJ found that plaintiff has no past relevant work experience; however, based on the interrogatory submitted to the vocational expert, he concluded that plaintiff could

10

perform the requirements of unskilled/light level occupations such as handpacker, housekeeper, and shirt presser as they existed in the national economy. (R. 21-22).

Plaintiff challenges the Commissioner's decision, arguing that the ALJ failed to develop the record to the extent necessary for an unrepresented claimant with a mental impairment. (Plaintiff's brief, p. 1). Specifically, plaintiff takes issue with the ALJ's failure to order an IQ test to assess whether her impairments of bipolar disorder and low intellectual functioning met the criteria for Listing 12.05C. (Plaintiff's brief, p. 7). Plaintiff further contends that the ALJ erred by assigning greater weight to the opinion of Dr. Fleece, the non-examining psychologist, than to Dr. Rogers' opinion or to the opinion expressed by plaintiff's treating psychiatrist in Exhibit 9F. (Plaintiff's brief, p. 9).

### The ALJ's Consideration of the Medical Opinions

The Commissioner's regulations establish a "hierarchy" which provides a starting point in determining the weight to accord to medical opinions:

> The opinions of examining physicians are generally given more weight than non-examining physicians; treating physicians receive more weight than non-treating physicians; and specialists on issues within their areas of expertise receive more weight than non-specialists. See § 404.1527(d)(1), (2), (5). When the ALJ does not give controlling weight to the treating physician's opinion, the ALJ applies other factors such as the length of treatment, the frequency of examination, the nature and extent of the relationship, the opinion's supportability, the opinion's consistency with other evidence, and the physician's specialization. See §404.1527(d)(2)-(6).
>
> The treating physician's opinion "must be given substantial or considerable weight unless good cause is shown to the contrary." Phillips [v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004)](citation and quotation marks omitted). "[G]ood cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Id. at 1241 (citation and quotation marks

11

omitted). When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. See Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir.2005) (per curiam).

Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion).

The ALJ claims to have assigned "great weight" to both Dr. Fleece's and Dr. Rogers' opinions. Yet, their opinions concerning plaintiff's intellectual abilities conflict to some extent. As noted above, Dr. Rogers estimated that plaintiff's "actual IQ is probably around 70, possibly slightly lower[,]" and, after noting plaintiff's history and daily activities, Dr. Rogers concluded that, "[i]n general, nothing in her history suggests that she has ever functioned above the level of Mild Mental Retardation." (R. 272). Regarding Dr. Rogers' diagnosis of probable mild mental retardation, Dr. Fleece notes that plaintiff's 30 out of 30 score on the MMSE while hospitalized with active psychotic symptoms "[s]uggest[s] [the] possibility of higher intellect than she presented on CE for disability. (R. 288). In his analysis of Listing 12.05, Dr. Fleece indicated the presence of "[a] medically determinable impairment," specifically, "r/o longitudinal very low intellect." (R. 280). However, without any analysis, the ALJ concluded at step two that plaintiff has "low intellectual functioning," which is very close to Dr. Fleece's "rule out" diagnosis, except that the ALJ omitted the "very." (R. 17, 280). Additionally, he rejected Dr. Rogers' opinion that plaintiff's "ability to obtain and maintain employment appears to be fairly poor," giving greater weight to "Dr. Hedberg[']s "opinion that the claimant would be able to participate in vocational rehabilitation" (R. 21), which the ALJ believed "indicated that Dr. Hedberg felt the claimant was capable of performing work activity." (R. 20). The ALJ did not mention Dr. Hedberg's

12

June 2007 opinion that plaintiff's condition substantially reduced her ability to work and would continue to do so for more than six months. (Exhibit 9F). The vocational expert opined in his answers to the written interrogatory that a claimant with the ability to perform light work would not be able to return to her past work or to work at any jobs in the national economy, "[c]onsidering [Dr. Rogers'] comments" in Exhibit B5F. (R. 85).

Thus, it is clear that, rather than actually according Dr. Rogers' opinion "great weight," the ALJ assigned it far less weight than he did Dr. Fleece's opinion. It further appears that the ALJ was unaware of the treating physician's conclusions in Exhibit 9F, as he did not mention them his opinion.[2] The ALJ effectively turned the normal hierarchy regarding medical opinions on its head, giving no weight to the June 11, 2007 opinion of Dr. Hedberg (the treating psychiatrist), more weight to the opinion of Dr. Rogers (the consultative psychologist), and the greatest weight to the opinion of Dr. Fleece (the non-examining state agency psychologist). The ALJ may do this, of course, provided that he explains his rationale and his reasons are supported by substantial evidence. See Carson v. Commissioner of Social Security, 2010 WL 1544734, *2 (11th Cir. Apr. 20, 2010)("'The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error[,] [however,] [t]he ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.")(citations omitted).

---

[2] The court recognizes that it may not have been immediately clear that Exhibit 9F was the opinion of Dr. Hedberg. However, it *is* apparent that the opinion is from a treating source at the Montgomery Area Mental Health Center.

Because the ALJ failed to address inconsistencies in the medical opinions to which he assigned "great weight" and because he failed even to mention Dr. Hedberg's June 2007 opinion at any point in his decision, this court cannot conclude that the ALJ properly weighed the various medical opinions of record regarding the effect of plaintiff's mental impairments, and must reverse the decision of the Commissioner. See Luckey v. Astrue, 331 Fed. Appx. 634 (11th Cir. 2009)(reversing and remanding due to ALJ's failure to explain the weight he had given to medical opinions; noting particularly his omission of significant diagnoses); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)("Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"); Ryan v. Heckler, 762 F.2d 939, 941 (11th Cir. 1985)("[A court] cannot . . . conduct a review that is both limited and meaningful if the ALJ does not state with *sufficient clarity* the legal rules being applied and the weight accorded the evidence considered." )(emphasis added)).[3]

---

[3] In view of the need for the Commissioner to reconsider all of the medical opinions, including Dr. Rogers' diagnosis of "probable mental retardation" and Dr. Fleece's opinion suggesting the need to rule out "very low intellectual functioning," it would be premature to resolve the issue regarding whether the ALJ erred by failing to order IQ testing. The Commissioner suggests that the ALJ did not err because "the record established that Plaintiff did not have deficits in adaptive functioning" and, accordingly, plaintiff would not have met Listing 12.05C notwithstanding her IQ scores. (Commissioner's brief, p. 12). The ALJ found that plaintiff has a "severe" mental impairment. The Commissioner acknowledges that, if there is evidence of valid IQ scores of 70 or below, the Commissioner bears the burden of rebutting the presumption of disability by demonstrating that she did not manifest deficits in adaptive functioning before the age of 22. (Id., p. 10)(citing Hodges v. Barnhart, 276 F.3d 1265 (11th Cir. 2005)). Deficits in adaptive functioning may appear in a number of different areas, including "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety" (see DSM-IV-TR at p. 41) and a diagnosis of mental retardation suggests consideration of adaptive functioning (id., pp. 41-42). Although the ALJ acknowledged Dr. Rogers' diagnosis of probable mental retardation and that "her actual IQ was estimated around 70" in his summary of the evidence (R. 18), he did

14

**The Interrogatory to the Vocational Expert**

The ALJ's August 24, 2007 letter to the plaintiff about the waiver of the right to appear at a hearing indicated that he would be "making a decision based only on the evidence in the file." (R. 31). There is no indication in the record that the VE's October 23, 2007 response to the interrogatory was proffered to the plaintiff for comment at any time before the ALJ's decision. (See Exhibit B-11E, R. 85). This constitutes an additional basis for reversal. See Cowart v. Schweiker, 662 F.2d at 737 (due process denied by ALJ's consideration of medical reports obtained post-hearing, where the ALJ relied substantially on the reports and the claimant was not given the opportunity to challenge them); Townley v. Heckler, 748 F.2d 109 (2nd Cir. 1984)(use of a VE's post-hearing response to interrogatory violated claimant's due process right where, although ALJ advised claimant's attorney that he had identified a need for evidence from a vocational expert and asked the attorney to submit questions, the ALJ did not provide the VE's responses to the claimant's attorney and refused his request to cross-examine the VE); see also Social Security Administration Hearings, Appeals and Litigation Law Manual, HALLEX § I-2-5-58 ("When

---

not discuss or analyze Dr. Rogers' conclusion, stated after she set forth examples of plaintiff's activities, historically and currently, that "nothing in [plaintiff's] history suggests that she has ever functioned above the level of Mild Mental Retardation." (R. 272). If the ALJ's decision reflected that he had actually considered this opinion but decided that the evidence of record demonstrated that plaintiff did not manifest deficits in adaptive functioning before age 22, the court could review that conclusion to determine whether it is supported by substantial evidence. No such analysis is evident in the decision, and the court declines the Commissioner's invitation to weigh the evidence itself, in the first instance, and make a factual determination on the issue of adaptive functioning. See Nyberg v. Commissioner of Social Security, 179 Fed. Appx. 589, 592 (11th Cir. 2006)(rejecting Commissioner's "harmless error" argument, stating, "[w]e cannot say that the failure to address Dr. Trowbridge's opinion was harmless without re-weighing the evidence and engaging in conjecture that invades the province of the ALJ"); Battle v. Astrue, 243 Fed. Appx. 514, 523 (11th Cir. 2007)(unpublished opinion)(explaining that it is the duty of the ALJ to weigh the evidence and to resolve any conflicts in the evidence).

the ALJ receives a VE's response to his or her interrogatories, the ALJ must . . . [p]rovide a copy of the response to the claimant and the representative and notify them of the right to comment, submit further relevant evidence, propose additional interrogatories to the VE, and request a supplemental hearing with opportunity to question the VE at the supplemental hearing. The ALJ will provide the claimant and the representative with the opportunity to review the VE's response before making it an exhibit, unless they have waived the right to examine the evidence or the evidence supports a fully favorable decision.).

An additional and substantial problem with the interrogatory is that the ALJ submitted it to the vocational expert without first determining plaintiff's RFC, except for an exertional limitation to light work. His interrogatory to the VE instructed the VE to "assume full range of light," "[c]onsider Exhibits B-2E, B-3E, B-5F (page 5), B-7F, and B-8F." Exhibit B2E is plaintiff's adult disability report, B3E is her work history report, B5F is Dr. Rogers' report, and B7F and B8F are Dr. Fleece's PRTF and mental RFC assessment. The interrogatory then states, "[p]lease consider the effect of all of the claimant's impairments in combination. Are there jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his/her medically determinable impairments?" (R. 85). As noted above, the ALJ found that plaintiff "has the residual functional capacity to perform light work and those limitations found in Exhibits B2-E, B3-E, B5-F, B7-F and B8-F which reflect the claimant has moderate limitation in activities of daily living, moderate limitation in social functioning and moderate limitation in maintaining concentration, persistence or pace." (R. 19)(emphasis added). He then "further" adopted some of the specific limitations set forth

by Dr. Fleece, including plaintiff's need for "flexibility with work hours and scheduling," her need for "greater than average training," and that she "may show some suspicious distractibility if asked to work in close proximity with others, but effect would fade to a degree with exposure." (Id.). The VE's response to the interrogatory states that Exhibits B7F and B8F (Dr. Fleece's PRTF and RFC assessment) "suggest that she can work at simple repetitive jobs with little interaction with the general public[.] Utilizing these two exhibits she could [work as a handpackager, housekeeper cleaner, or shirt presser]." (R. 85).

Essentially, the interrogatory asked the VE first to formulate an RFC based on the VE's understanding of the listed exhibits and then to render an opinion on available jobs. In response, the VE referenced Dr. Fleece's PRTF and RFC assessment, but specifically noted only two limitations: (1) simple, repetitive work; and (2) little interaction with the general public. In order to constitute substantial evidence at Step 5, the VE's response regarding available jobs must be based on a question containing all of plaintiff's limitations. See Carman v. Astrue, 352 Fed. Appx. 406, 408 (11th Cir. 2009)(finding step 5 determination to be supported by substantial evidence where the ALJ's hypothetical question to the VE included "all of [the claimant's] credible limitations"). It is not possible to tell from the VE's response whether he credited all of the limitations suggested by Dr. Fleece or only the two specifically mentioned by the VE. Thus, it is not apparent that his response takes into account the specific limitations included by the ALJ, such as the need for flexibility in scheduling and greater than average training. Additionally, the VE's conclusion that Dr. Fleece's opinion permits "*little* interaction with the general public" does not mirror Dr. Fleece's opinion that

17

plaintiff's "contacts with the general public should be *eliminated*." (R. 85, 292)(emphasis added).[4]  The ambiguity created by the Alj's decision merely to list exhibits in the interrogatory to the VE appears to have caused the ALJ to introduce a similar ambiguity into his RFC formulation and precludes a finding that the ALJ's step 5 determination is supported by substantial evidence, even if the ALJ had not otherwise erred in his evaluation of the evidence.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and this action REMANDED for further administrative proceedings consistent with this Memorandum Opinion.

Done, this 15th day of June, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[4] In his step 5 analysis, the ALJ glosses over these discrepancies. He states:

> To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge mailed an interrogatory to Dr. Randall McDaniel, a vocational expert, and asked him to assume an individual that has the residual functional capacity as set out above (more specifically, full range of light and Exhibits B2-E, B3-E, B5-F, B7-F and B8-F), along with the same age and education of the claimant and to determine if there were jobs that existed in significant numbers in the regional and national economy. Dr. McDaniel submitted his opinions on such on October 23, 2007.  The vocational expert stated that given all of these factors the individual would be able to perform the requirements of representative occupations at the unskilled/light levels such as [handpacker, housekeeping cleaner, and shirt presser].

(R. 22).